### SUTTER et al. v. CITY OF NEW YORK.

(District Court, E. D. New York. November 6, 1919.)

COLLISION ⬤⟹102—NEGLIGENT NAVIGATION IN SNOWSTORM.

 A collision in Buttermilk Channel between a ferryboat and a smaller boat, in a heavy snowstorm which prevented them from seeing each other until close, *held* due to faults of both vessels in going at excessive speed and failing to observe the rules for fog or storms.

In Admiralty. Suit for collision by Alphone Sutter and another against the City of New York. Decree for libelants for half damages.

Foley & Martin and J. A. Martin, all of New York City, for libelants.

Lamar Hardy and George P. Nicholson, both of New York City, for respondent.

CHATFIELD, District Judge. On March 22, 1916, the municipal ferryboat Bay Ridge was proceeding from the slip near the Battery in Manhattan to the slip at Thirty-Ninth street, Brooklyn, on the trip beginning at 9:20 a. m. The ferryboat proceeded through the Butter-

milk Channel, encountering a strong flood tide all of the way. She was on her compass course, but apparently a little nearer than usual to Brooklyn because of a blinding snowstorm, which made the Brooklyn shore line only an indistinct blur. This compass course was changed, as was the custom, when the boat reached the turn of the shore at Red Hook. In order to proceed through the narrower Red Hook Channel to the Thirty-Ninth street ferry slip, the ferryboat ordinarily does, and apparently did on this morning, make a sharp turn under a starboard helm, going closer to Brooklyn, but still leaving room for any boat coming up at a uniform distance from the Brooklyn shore to pass the ferryboat port to port. The snow in the air was so dense that small boats were visible only some 250 or 300 feet. The ferryboat was visible nearly twice that distance, and was observed just as it started to make the turn in question by the Stanley Howard, which had come up from Fifty-Seventh street, through the Bay Ridge Channel, and was intending to proceed up the Buttermilk Channel to the Battery.

The Howard was a converted oyster boat, which was then being used by certain divers for wrecking operations in the North River. They intended to call at the Battery, pick up the superintendent, and, if conditions were right, reach the wreck in the North River at slack high water. The Howard was not capable of great speed, but with the flood tide was evidently proceeding up the channel at a rapid rate. She had on board a large quantity of dynamite, and was displaying from her mast a large red flag to indicate the presence of explosives. She was a small boat, and apparently cut across from the Bay Ridge Channel to the Buttermilk Channel on a course which would intersect that of the ferryboat Bay Ridge, inasmuch as the Howard was intending to pass up the Buttermilk Channel on the starboard or Brooklyn side of midchannel. When she first sighted the ferryboat, she blew a one-whistle signal. Just after this one-whistle signal, the ferryboat sighted the Howard and blew a two-whistle signal to indicate to the Howard that the ferryboat was making a turn toward Brooklyn and was in effect crossing the Howard's bow. The Howard, which had already ported her helm, so as to go further inshore and cross the ferryboat's bow, answered with another single whistle. These whistles were followed immediately by alarms, and the ferryboat reversed. Just before the collision the captain of the ferryboat, observing the red flag and fearing the consequences, stopped the engines of the ferryboat, thereby preventing probable destruction of the Howard, with a possible explosion of the dynamite.

The Bay Ridge has a propeller wheel at each end, operated by a single shaft. It is evident that, with both propellers reversing, the ferryboat did not succeed in obtaining sternway, or even in stopping her headway, as the ferryboat cut into the Howard with considerable force. The ferryboat, proceeding on her route against the flood tide, was evidently moving at what was under those conditions a rapid rate of speed.

The witnesses upon the ferryboat are in accord that the Howard, when first sighted, was approaching and was off the starboard bow of the ferryboat. This is in exact agreement with the testimony of the witnesses for the Howard. But the witnesses for the Bay Ridge insist

that the Howard when first sighted was headed in such direction that, if she had not ported her helm and attempted to cross the Bay Ridge's bow, she would have passed the Bay Ridge from 50 to 150 feet port to port.

It must be remembered that the Bay Ridge was turning toward Brooklyn at the time. When coming down Buttermilk Channel the Bay Ridge and the Howard would have been on crossing courses, but with the Bay Ridge on the Howard's starboard hand. Under these circumstances it was the duty of the Howard to keep out of the way, so that the boats could pass port to port. This she evidently tried to do, and there is no basis for the suggestion that the Howard was going across Buttermilk Channel toward New York Bay and below Governors Island.

If the Bay Ridge, therefore, had sighted the Howard before making her turn under a starboard helm, it was the duty of the Bay Ridge to continue her course and to make the turn under the Howard's stern. If the Bay Ridge had completed her turn before she was sighted by the Howard, and the boats were on crossing courses, the Bay Ridge was still obligated (as she had the Howard upon her starboard hand) to keep out of the way, and when she indicated by a two-whistle signal that she would cross the Howard's bow, she assumed the responsibility for that maneuver, unless the Howard thereafter deliberately or carelessly changed her course. The testimony shows satisfactorily that the Howard, not only did not change her course, but that she had already indicated by whistle that she was passing to port of the ferryboat, and her movement toward Brooklyn was in pursuance of the navigation which she herself had instituted, and as to which the ferryboat responded by a cross-signal. The lookouts upon the ferryboat reported that the Howard was approaching to starboard, and the ferryboat was plainly at fault, unless the Howard was at all times on a course to pass outside of the ferryboat, after the boats were visible to each other.

It is impossible to find, after hearing the witnesses, that the pilot of the Howard was attempting to navigate a boat loaded with dynamite directly across the bow of a rapidly approaching ferryboat, under a wide sheer to starboard and with the giving of a contradictory whistle to the two-whistle signal of the ferryboat. In addition, the witnesses for the ferryboat testify that the Howard was 300 feet away when first observed. If in proceeding 300 feet she crossed the intervening space of 150 feet, and got across the bow of the ferryboat, which was at the same time turning toward Brooklyn under a starboard helm, the Howard must have been trying to dynamite the ferryboat rather than to navigate safely to her destination. The evidence does not justify any such finding, but does lead the court to conclude that the ferryboat was sighted by the Howard before the Howard was sighted by the ferryboat, that the course of the ferryboat was then changed, and that the Howard had the right of way.

If this accident had happened in clear weather, responsibility therefor would rest for this reason entirely upon the ferryboat. But the ferryboat seems to have had lookouts and officers attentive to their work

and carefully observing the handling of the boat, in view of the storm conditions. The captain of the ferryboat used good judgment in reversing his boat until just before the collision, and then stopping his engine to avoid smashing the Howard, with possible explosion of the dynamite. The entire maneuver carried the two boats toward the Brooklyn shore, as they swept up into the Buttermilk Channel, where the Howard submerged and finally sank close to the Brooklyn piers, toward which she may have been drawn by a water boat which attempted to tow her ashore.

It would appear, therefore, that the collision was further to the south than the location fixed by the captain of the Howard, who was not definite in his description of the streets near which the accident occurred. There was some testimony that the crew of the Howard called the attention of the captain to the fact that they had questioned the advisability of proceeding in the snowstorm. It seems likely from the testimony of all the witnesses that the trip to the Battery was unnecessary, except to get in communication with the inspector, as the work done at the wreck would have to be postponed on account of the storm. The Howard was making, with the help of the flood tide, speed which in a fog would have been dangerous, and certainly would have rendered the Howard responsible in case of collision. On the other hand, the ferryboat was proceeding with greater speed through the water, and the two boats were approaching each other under such conditions of light and obstructed vision that alert lookouts on the ferryboat did not discover the Howard until she was within 300 feet. On the other hand, the lookouts on the Howard, while they discovered the ferryboat, evidently did not observe that she was turning across their bow, and the captain gave a one-whistle signal, when no signal at all might have been necessary, if the weather had been clear and the Howard had not attempted to keep inside of the ferryboat's course.

Under these circumstances, as in the case of a collision in a fog, it must be held that both boats were failing to observe the rules and to apply the ordinary rules of navigation, so as to make that navigation safe in a storm.

The libelants may have a decree for one-half their damages, and with costs.